## JOHN WAGGEMAN

*v.*

## THE VILLAGE OF NORTH PEORIA.

*Filed at Ottawa October 11, 1895—Rehearing denied March 10, 1896.*

1. APPEALS AND ERRORS—*contest as to perpetual easement involves a freehold.* The disputed claim by a municipality of a perpetual easement, by common law dedication or by prescription, in an alleged highway, involves a freehold within the jurisdiction of the Supreme Court.

2. HIGHWAYS—*relation of municipality to previously existing highway.* A municipal corporation, in which is situated a public highway or street which had been dedicated to public use prior to the existence of the municipality, is vested with the use thereof in trust for the public.

APPEAL from the Circuit Court of Peoria county; the Hon. THOMAS M. SHAW, Judge, presiding.

JAMES A. CAMERON, and LOUIS F. MEEK, for appellant.

ARTHUR KEITHLEY, for appellee.

Mr. JUSTICE BAKER delivered the opinion of the court:

This is an action of debt, prosecuted by the village of North Peoria, against John Waggeman, to recover a penalty for obstructing the south 294 feet of Linn street, in said village, by building a fence across the same, in violation of an ordinance of the village. A jury was waived and the issues were submitted to the court. The court

found the defendant guilty, and rendered judgment against him for a fine of $25 and costs.

An action brought by a municipal corporation against a defendant for obstructing an alleged highway on the land of such defendant, in which such municipality claims a perpetual easement by common law dedication or by prescription, which claim is disputed, involves a freehold. (*Chaplin* v. *Comrs. of Highways*, 126 Ill. 264; *Town of Brushy Mound* v. *McClintock*, 146 id. 643.) The appeal in this case, therefore, is properly taken directly to this court.

In *Waggeman* v. *Village of North Peoria*, 155 Ill. 545, there was before us the matter of a special assessment on the property of appellant, made for the purpose of opening and extending Linn street, in said village, from Richmond avenue south to the north line of the strip of land 294 feet long and 66 feet wide that is here involved. We there reversed the assessment of special benefits made by the jury on the adjoining property of appellant, and the judgment of confirmation, on the express ground that the evidence in that record did not clearly and satisfactorily show a dedication to the public, for the purposes of a public highway, of this strip of ground that is here in question, and that lies between the territorial limits of the city of Peoria and the strip of land 147 feet long that had there been condemned for a part of Linn street, and that the jury had improperly assessed benefits upon the theory said strip of 294 feet was part of a public street,—and that cause was thereupon remanded to the county court for another trial. The same question that thus arose collaterally in that litigation is directly involved in this. The record now before us not only contains substantially all the testimony that was then considered, but also new evidence which impresses us as being very material.

The claim is made in this case that in 1878 one James M. Morse owned a lot in the city of Peoria that was immediately south of the premises of appellant, which lot was 98 feet wide from north to south and extended on

both sides of and across the so-called Linn street; that appellant had a fence across Linn street, adjoining the north boundary line of the city and on the line where his present fence is located, which prevented Morse and the public from going north on Linn street; that Morse thereupon built a fence, or, rather, constructed, with railroad ties set on end, a barrier across said street on his south lot line, which effectually cut off appellant, on the south, from ingress and egress to and from his premises, and that, by virtue of a written agreement then made between appellant and Morse, appellant removed his fence or fences and threw open the strip of land 294 feet long and 66 feet wide to the public as a part of Linn street, and thereby dedicated it as a part of the public highway.

James M. Morse testifies, in substance, as follows: "The agreement in regard to opening the street was in writing. My recollection is that the agreement, when executed, was delivered to O. J. Bailey. I have not got it. I think I last saw it at that time. The agreement in writing, as my recollection now is and has been, was an agreement on my part to accept two fences and so much money to cover costs, etc., to be paid to me for allowing the street to go across my ground, and the agreement on Mr. Waggeman's part was that the street should be opened to Klew's lane. That agreement was signed by Mr. Waggeman, and by me also. In pursuance of that agreement the street was opened so you could drive down Linn street and out through Klew's lane to the Knoxville road. Waggeman's fences were removed, and the people commenced using the street right away after this agreement."

O. J. Bailey testifies: "I was one of the parties to the settlement growing out of the differences between Morse and Waggeman. The defendant, Waggeman, was a party to that settlement. I remember that the settlement was consummated and expressed in writing about that time. I have not got that writing. I have made very diligent

search to find it but cannot find it. I have not only looked in all places where it would be likely to be if I had it, but in every other place I could think of. I do not know where it is now. I have no distinct recollection of having been made the custodian of the agreement, nor have I any distinct recollection of having had the agreement in my possession subsequent to its execution. Mr. Morse certainly did have it at the time it was consummated. It was in his hands at that time, but into whose hands it went for keeping after that I am not able to say. My distinct recollection is that that agreement was signed by Waggeman. The agreement provided for the payment of a certain amount, including the costs in the case that was pending in the county court, if I remember correctly, by which the parties to that agreement should divide the costs, the agreement stating the proportion in which they should pay them. The agreement stated, in addition, the proportion in which a certain gross sum should be paid to the parties interested in the opening of the street, and that from and after the payment of that amount all obstructions should be removed and the ground to remain as a street. I cannot remember distinctly whether there was anything in the agreement with reference to providing for Linn street being opened on the north and past Waggeman's residence, because as to that there was no controversy. Mr. Waggeman was seeking at that time to have the street opened. Money was contributed by the citizens in that locality to purchase the opening up of Linn street at that time. I contributed $65, and $25 of it went to Waggeman for my share of his portion for any claim that he had to that part of the street north of this barricade." Said witness further testifies that after this money was paid and this agreement was signed and delivered the barricade and other fences were removed.

Abraham Edwards testifies that he had a conversation with Waggeman after the barricade was taken down; that

the conversation was, that Waggeman would not open the north end, and so Morse shut up and fenced Linn street, and there was a controversy between the two parties; that Waggeman wanted to have an open way out south but would not give an open way north, and they compromised by Morse taking down his fence and Waggeman was to do the same, so as to have the street open clear through. And Edwards testifies that Waggeman told him, in that conversation, that he had agreed to open the street on the other end and Morse had agreed to take the fence or barricade away and throw it open, so they could travel north and south.

Appellant, in his testimony, contradicts these witnesses. The trial court, however, saw all the witnesses upon the stand and heard them testify, and seems to have given credit and belief to the testimony of Morse, Bailey and Edwards. We are unable to say that it erred in so doing. We also think that under the circumstances of the case, and in view of the fact that appellee was not a party to the written agreement and never had it in its possession or control, the proofs of the loss of that agreement were sufficient to serve as a foundation for the introduction of secondary testimony. Morse says the agreement, when executed, was delivered to O. J. Bailey. Bailey does not deny this, but says that he has no distinct recollection of having been made its custodian, and no distinct recollection of subsequently having it in his possession. There can be no question but that he has made all the search for it that could reasonably be required of him. The circumstances of the transaction and the adverse interests of all the other parties render it highly improbable,—almost morally impossible,—that the written agreement was left in the hands of Morse; and Morse testifies positively that he has not got it, and thinks the last time he saw it was when it was executed and delivered to Bailey.

Our conclusion is, that the evidence in regard to this agreement, and the subsequent conduct and acts of appellant under and in pursuance of it, when taken in connection with the other evidence, sufficiently justify the finding and judgment of the circuit court.

It is wholly immaterial that the village of North Peoria had not been organized at the time of the dedication. If there is a common law dedication of a public highway or street to public use prior to the existence of a municipal corporation, then, upon such corporation coming into being, the use of the highway or street, in trust for the public, at once vests in it.

The judgment is affirmed.                *Judgment affirmed.*